NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AUGUSTON PRIETO,** | Civ. No. 2:14-cv-4998 (WJM) |
| **Plaintiff,** | |
| | **OPINION** |
| v. | |
| **CAROLYN W. COLVIN,** **Acting Commissioner of Social Security,** | |
| **Defendant.** | |

**WILLIAM J. MARTINI, U.S.D.J.:**

   Plaintiff Auguston Prieto brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner's final determination denying his application for Supplemental Security Income ("SSI") for the period between the onset date and his 50th birthday. For the reasons that follow, the Commissioner's decision is **AFFIRMED**.

## I. LEGAL STANDARDS

### A. The Five–Step Sequential Analysis

   Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. In the first step, the Commissioner determines whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. *Id.* §§ 404.1520(b), 416.920(b). If not, the Commissioner moves to step two to determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, the Commissioner inquires in step three as to whether the impairment meets or equals the criteria of any

impairment found in the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A. If so, the claimant is automatically eligible to receive benefits (and the analysis ends); if not, the Commissioner moves on to step four. *Id.* §§ 404.1520(d), 416.920(d). In the fourth step, the Commissioner decides whether, despite any severe impairment, the claimant retains the residual functional capacity ("RFC") to perform past relevant work ("PRW"). *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f). The claimant bears the burden of proof at each of these first four steps. At step five, the burden shifts to the Social Security Administration to demonstrate that the claimant is capable of performing other jobs that exist in significant numbers in the national economy in light of the claimant's age, education, work experience and RFC. 20 C.F.R. §§ 404 .1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.,* 474 F.3d 88, 91-92 (3d Cir. 2007) (citations omitted).

### B. Standard of Review

For the purpose of this appeal, the Court conducts a plenary review of the legal issues. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). The factual findings of the Administrative Law Judge ("ALJ") are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart,* 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (*citing* 42 U.S.C. § 405(g)).

## II.    BACKGROUND

Over the last 15 years, Plaintiff has worked in 6-month stints as an electrician helper and a tractor-trailer driver. Administrative Transcript ("Tr.") 204. His record also indicates that he did not work from 1993 to 1996, nor from 2000 to 2005. Tr. 56-57. Plaintiff's earnings records show a total of $696 in a ten-year period. Tr. 57. He has an 11th grade education. Tr. 42. In November 2010, Plaintiff filed an application for SSI. Tr. 19. The Commissioner denied Plaintiff's application at the initial and reconsideration levels of administrative review. Tr. 115, 125. Plaintiff requested a hearing before an ALJ. Tr. 128. In August 2012, Plaintiff and his attorney appeared at an administrative hearing before ALJ Joel H. Friedman. Tr. 35-91. The Plaintiff and a vocational expert testified. Tr. 35. In January 2013, the ALJ issued a decision finding Plaintiff disabled as of June 11, 2012, the date of Plaintiff's

50th birthday and his transition into a different age category under the Commissioner's Medical-Vocational Guidelines. Tr. 19-31.

Plaintiff requested further administrative review of the ALJ's finding that he was not disabled before his 50th birthday. Tr. 9, 288. The Appeals Council denied Plaintiff's request for review and notified him that the ALJ's decision stood as the Commissioner's final decision. Tr. 1. This appeal followed. Plaintiff alleges disability since July 2010. Tr. 186. However, applicants cannot receive disability for any time earlier than the month preceding application. 20 C.F.R. § 416.335. Thus, the Court treats Plaintiff's appeal as a request for further review of the ALJ's finding that he was not disabled between November 2010 and June 2012.

### A. Summary of the Record

The record includes diagnostic test results, notes from visits to treating physicians, and medical evaluations from examining physicians. It also includes Plaintiff's application for SSI and his testimony about his symptoms, daily activities, personal history, and work experience. Finally, it includes testimony from a vocational expert.

Plaintiff claimed disability based primarily upon back pain. The most obvious cause of the pain was a compression fracture at L1. Tr. 293, 348. Images of the fracture were captured via MRIs dated May 13, 2010 and April 21, 2011. Tr. 37, 40, 293, 327. The back pain had been a problem since about 2001. Tr. 326. An examining physician, Dr. Justin Fernando, believed that the fracture was probably caused by Plaintiff's habitually jumping the four or five feet from the seat of the truck he drove for work to the ground. Tr. 326.

Plaintiff's lumbar spine MRIs showed no disc herniation, spinal canal stenosis, or nerve root impingement. Tr. 293, 332, 392. Dr. Fernando performed a reflex test on February 28, 2011, and opined, "Reflexes being as brisk as they are, it is highly unlikely he has any significant disk herniations or nerve root impingement." Tr. 328.

As time went by, the pain became worse and began to include radicular pain and numbness in the lower extremities. Tr. 326.

Plaintiff's second major complaint was neck pain. He described experiencing neck pain with radicular pain and numbness affecting the upper extremities. *See* Tr. 326. There are three 2010 radiology reports relevant to this neck pain. First, on May 13, 2010, an MRI of his right shoulder revealed a partial articular tendon tear and acromioclavicular disease. Tr. 308, 369. An MRI of his left shoulder showed tendonitis, enlargement of the acromioclavicular joint without impingement, and

3

excess fluid in the joint space extending into the subscapular bursa. Tr. 291. A July 22, 2010 MRI of his cervical spine revealed a small central disc protrusion at C6-7 with mild flattening of the ventral thecal sac and ventral margin of the cord with no abnormal cord signal. Tr. 370. A September 23, 2010 MRI of his thoracic spine revealed mild spinal stenosis at T2-3, T4-5, T10-11 and T11-12, narrowing of the lateral recess, and left neural foraminal narrowing a T10-11 and T11-12. Tr. 367-68. One of Plaintiff's examining physicians, Dr. Elesser, stated in his 2011 report that Plaintiff's complaints of neck pain were probably due, in part, to the old shoulder injury and degenerative changes of the spine. Tr. 386.

As the Plaintiff's pain got worse over time, he began managing the pain with medication, including prescription narcotics. On June 20, 2011, he reported to University Hospital, where he told a physician the pain was "tolerable" with percocet use, but that he had run out and was experiencing pain that was 8/10. Tr. 341. On August 15, 2011, he reported to University Hospital again, noting that he had run out of drugs and that the pain was 9/10. Tr. 338.

Problems with associated muscle spasms were noted in the medical records. Tr. 392. At the hearing, he complained of muscle spasms as being part of his daily life. Tr. 44-45. He said the muscle spasms are caused by bending or exerting himself physically. Tr. 62. He complained that a spasm could cause him to drop to the ground. Tr. 62. He stated that if he gets a spasm, he has to put on a patch and heating pads. Tr. 45.

Plaintiff's third complaint is heart disease. His symptoms included chest pains, heart palpitations, and sweating related to heart disease. Tr. 65-66. He controlled the heart disease symptoms with nitroglycerin. Tr. 65-67.

Plaintiff underwent several cardiac studies between 2009 and 2011, but none of them revealed particularly alarming conditions. An aorta exam in December 2009 found no atherosclerosis disease and normal systolic velocities. Tr. 323. A cardiac evaluation in January 2010 found an ejection fraction of 65%, as did a transthoracic echocardiography in January 2011. Tr. 290, 303.[1] The January 2010 evaluation noted that Plaintiff had an "excellent angiographic result." Tr. 290. Dr. Park described Plaintiff's cardiac disease as "stable" in September 2010 and October 2010.

A January 2011 carotid ultrasound showed no evidence of carotid disease, and Plaintiff's Doppler velocities and ratios appeared within normal limits. Tr. 302. The

---

[1] An ejection fraction of 65% is within the normal range.

4

January 2011 transthoracic echocardiography found Grade I diastolic dysfunction, which is the mildest form of diastolic dysfunction. Tr. 303. In April 2011, a cardiac catheterization revealed non-obstructive coronary artery disease and a small-diameter vessel left arterial descending artery. Tr. 373. In April 2011, a cardiac catheterization revealed non-obstructive coronary artery disease and a small-diameter vessel left arterial descending artery. Tr. 373. Edo Kaluski, M.D. recommended medical therapy. *Id*. In April 2011, Plaintiff's cardiovascular examination revealed a normal heart rate, rhythm, and sounds, and intact distal pulses with no gallop, rub, or murmur. Tr. 349. In June 2011, an exam noted normal heart rate, rhythm, and sounds, and intact distal pulses with no murmur. Tr. 342. Nevertheless, throughout this period, Plaintiff did complain intermittently of chest pain, sweating, and sometimes, of breathing difficulties. Tr. 304, 316-317, 321, 346.

In his testimony and paper application, he complained that he had to take "ten medications" for pain, including oxycodone, zolpidem[2], diazepam, and endocet. Tr. 40, 49, 214, 217. At his hearing, he said he was taking oxycodone six times a day, Tr. 49, which was fairly consistent with what he had been reporting to treating and examining doctors.[3] At his hearing, he stated that these drugs made him feel "doped up," sleepy, drowsy, slow, and itchy. Tr. 49-50. He claimed that the medications caused blurred vision. Tr. 44. He also stated, somewhat contradictorily, that "I think the only main side effect that I have is, is my sexual desire that I have has just totally gone away." Tr. 49.

On Plaintiff's November 18, 2010 application, he answered the question "how long can you pay attention?" with "not long." Tr. 215. He answered the question, "How well do you follow spoken instructions" with "not well." Tr. 215. On the same application, where he was asked to check off boxes listing activities that his condition affected, he did not check off boxes indicating impairment of his ability to see, understand, talk, hear, remember, concentrate, or follow instructions. Tr. 214-215.

At his hearing, Plaintiff stated that he no longer drives because of the medication, because of difficulty moving, and because he cannot afford it. Tr. 41. There are no medical records documenting side effects of the medication or an inability to concentrate.

---

[2] Generic name for Ambien, a drug used to treat insomnia. 3 Attorneys Medical Deskbook § 40:29.
[3] On February 28, 2011, Dr. Fernando noted that Plaintiff takes endocet, a mixture acetaminophen and oxycodone, 3 or 4 times a day and oxycodone twice a day. Tr. 327. On April 21, 2011 and August 15, 2011, he reported to doctors at University Hospital that he had been taking percocet, a mixture of acetaminophen and oxycodone, four times a day for two years. Tr. 338, 353.

5

Plaintiff said he could stand for about 15 minutes to half an hour at one time. Tr. 63. He stated that he could sit for about 1 hour, but then would have to get up, lie down, or assume a different position after the first hour. Tr. 63. He also said he could reach with his left shoulder only below shoulder height. Tr. 64.

He reported that he can no longer bike or go fishing, but that he still likes to play dominos or chess occasionally. Tr. 59.

He can go grocery shopping, but it involves very little lifting or carrying because the supermarkets in his town will send a bus, drive him to the supermarket, put his groceries on the bus, and put them on the sidewalk when he gets home. He only needs to carry the bag into the house. He reported that the bag cannot be more than five or ten pounds or else his back will spasm. Tr. 61-62. He can wash his clothes, prepare his own meals, and keep his personal area in the basement where he lives clean. Tr. 58.

Treating physicians' notes from 2011 repeatedly note that Plaintiff was drinking one or two six packs of beer a day. Tr. 334, 341, 345, 348, 353.

In February 2011, Justin Fernando, M.D. – an examining physician – conducted a consultative orthopedic examination of Plaintiff at the agency's request. Tr. 326. Dr. Fernando opined that:

> From an orthopedic standpoint, the claimant does not demonstrate any compelling clinical indication of significant disk herniation in the cervical or lumbosacral spine. Reflexes being as brisk as they are, it is highly unlikely he has any significant disk herniation or nerve root impingement by disk that are herniated in the cervical or lumbosacral spine. It is however significant in that his coronary and cardiac history make his pain problems more significant because of the symptoms of angina, which are stable for the most part, but he also gives history of instability sometimes requiring sublingual nitroglycerin. Under these circumstances, it is to his advantage and the advantage of others if he stays off the road and for those reasons, it is also to the advantage of everyone that he does not engage in any physically-demanding activities.

Tr. 328.

Two state agency doctors, one an orthopedist and the other an internist, reviewed Plaintiff's records in March 2011 and October 2011 respectively. Both opined that Plaintiff retained the ability to: occasionally lift and/or carry up to 20 pounds;

frequently lift and/or carry up to 10 pounds; stand and/or walk for about 4 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Tr. 92, 98-99, 112.

Plaintiff obtained two doctors to opine on his condition, Dr. Elesser in July 2010 and Dr. Herrera in October 2011. They both opined that Plaintiff could not work. Tr. 384-388. Both of these doctors wrote their opinions on forms submitted to the State of New Jersey Division of Family Development. Neither of these doctors performed any diagnostic tests.

At the administrative hearing, the ALJ asked the vocational expert whether a hypothetical individual with Plaintiff's vocational background (age, education, work history) could perform work that existed in the national economy if the individual were limited to the functional assessment outlined by the state agency physicians, but also had difficulty reaching above his shoulder and in front with his non-dominate hand, but could reach almost to shoulder height. Tr. 78-79. In response, the vocational expert testified that only 250 jobs would exist at the light exertional level but that jobs existed at the sedentary level, including: final assembler (DOT 713.687-018; SVP 2) (800 jobs in the local economy; 18,000 jobs in the national economy); table worker (DOT 739.687-182; SVP 2) (300 jobs in the local economy; 9,000 jobs in the national economy); and small hand packager, such as ampule sealer (DOT 559.687-014; SVP 2) (600 jobs in the local economy; 15,000 jobs in the national economy). Tr. 79-80. The vocational expert testified that a hypothetical individual could not perform any of the identified jobs if he needed to walk away from his workstation for more than 5 minutes each hour, or if he experienced pain or side effects from medication that caused difficulty maintaining concentration, persistence, or pace. Tr. 81-82.

### B. The ALJ's Decision

At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability. Tr. 25. At step two, the ALJ found that the Plaintiff has the following severe impairments: neck pain; s/p compression fracture, lumbar spine; tendinosis and degenerative joint disease of the shoulders, worse on the left; coronary artery disease; and hypertension. *Id.* At step three, the ALJ concluded that the Plaintiff's impairments or combinations of impairments do not meet or medically equal one of the impairments found in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix1, Part A. Tr. 25.

At step four, the ALJ found that Plaintiff has a physical RFC that would limit him to sedentary work. Specifically, the ALJ found that Plaintiff can: lift and carry

up to 10 pounds occasionally; stand/walk 2 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; perform unlimited pushing and/or pulling within the noted weight restrictions; and occasionally perform all postural activities.[4] Tr. 26. The ALJ also notes that Plaintiff's movements on his left side are restricted to shoulder height. *Id*. Where the medical consultants at the state agency and the testimony of Plaintiff and his doctors conflicted, the ALJ sided with the Plaintiff in limiting the amount of weight he could carry. Tr. 28. The ALJ also parted from the state physician's assessment of how long Plaintiff could stand or walk, based on his subjective complaints and his doctors' opinions. With this deference to the Plaintiff's subjective complaints, the ALJ concluded that Plaintiff's impairments restrict his options to sedentary work. Based on this RFC, and Dr. Fernando's advice, the ALJ concluded that Plaintiff cannot perform any past relevant work. Tr. 29, 328.

At step five, the ALJ concluded that the Commissioner had proven that there were a significant number of jobs in the national economy that Plaintiff could perform up until his 50th birthday. Tr. 30. However, pursuant to Grid Rule 201.14 of the Medical-Vocational Guidelines, Plaintiff became disabled on his 50th birthday, June 11, 2012. *Id.*

## III. DISCUSSION

There are three major issues in this appeal. First, whether, the ALJ should have considered this a borderline age case. Second, whether the ALJ made a legal error in failing to consider Plaintiff's impairments in combination. Third, whether there was legal error in or lack of substantial evidence supporting the ALJ's decision not to credit plaintiff's statements that that his symptoms of pain and medication side effects rendered him unable to work.

### A. This Case Does Not Present an Exceptional, Borderline Age Situation.

In cases involving supplemental security income claims, borderline age situations generally exist only when the claimant is "within a few days to a few months of reaching an older age category" on his alleged onset date. Application of the Medical-Vocational Guidelines in Borderline Age Situations, (HALLEX II-5-3-2), 2003 WL 25498826 (2003). By contrast, Plaintiff was approximately two years from reaching an older age category on his onset date. He cites no legal authority warranting the consideration of this case as borderline.

---

[4] "Postural activities" included in Plaintiff's RFC are balancing, stooping, kneeling, crouching, and crawling. Tr. 26.

### B. The ALJ Did Not Fail to Consider Plaintiff's Impairments in Combination.

Plaintiff argues that the ALJ erred at step three of the analysis by atomizing the Plaintiff's impairments and failing to consider them *in combination*. Plaintiff's Brief at 10 ("[T]he five impairments are examined as if they afflicted five separate individuals rather than the same plaintiff."). This is not an entirely fair characterization of the ALJ's analysis, and moreover, review of the step three analysis reveals no error.

The step three analysis centers around the "Listing of Impairments" found in Appendix 1 to the Social Security disability regulations, 20 C.F.R. Part 404, Subpart P. The Listing of Impairments documents all impairments that direct a decision of disabled *per se*. *See Farias v. Comm'r of Soc. Sec.*, No. 2:10-CV-03384, 2011 WL 2038781, at *1 (D.N.J. May 22, 2011) (*citing* 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920)). The impairments on the Listing of Impairments are so limiting as to direct a presumption that they "preclude *any* gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 521 (1990).

The Listing of Impairments "are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect."[5] *Sullivan v. Zebley*, 493 U.S. at 530. "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."[6] *Id.*

At step three, the Plaintiff's burden is to bring forth "medical evidence of his impairment" that "matches or is equal to one of a listing of impairments." *Sullivan v. Zebley*, 493 U.S. at 521. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria" *Id.* "An impairment that

---

[5] There are 125 impairments defined in the adult listings. The body system categories are: musculoskeletal, special senses and speech, respiratory, cardiovascular, digestive, genitourinary, hemic and lymphatic, skin, and endocrine. In addition, there are four groups of listings not categorized by body system: multiple body system impairments, neurological impairments, mental disorders, and malignant neoplastic diseases. *Sullivan v. Zelby*, 493 U.S. at 530 n. 6.

[6] For example, a plaintiff can prove the disability called "disorders of the spine" (Listing 1.04) if there is compromise to the nerve root or spinal chord accompanied by one of three other sub-collections of medical diagnoses: (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or (2) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or (3) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

manifests only some of those criteria, no matter how severely, does not qualify." *Id.* (*citing* SSR 83-19).

Where the plaintiff cannot establish that he explicitly meets the requirements of one of the listings, he can still meet his burden at step three by demonstrating an unlisted impairment or a combination of impairments that are "equal in severity" to *all* the criteria of one of the listed impairment that is most similar to plaintiff's particular impairments. *Id.* at 531 (*citing* 20 C.F.R § 416.926(a)). *See also* 20 C.F.R. § 404.1526(a) ("If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.").

Pursuant to the so-called *Cotter* Doctrine, the ALJ's duty at step three is only to provide enough analysis such that the Court can meaningfully review it. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000); *Torres v. Comm'r of Soc. Sec.*, 279 Fed. App'x 149, 152 (3d Cir. 2008); *Jackson v. Colvin*, No. 2:14-CV-02591 WJM, 2015 WL 3613554, at *5 (D.N.J. June 9, 2015). The regulations do not require the ALJ to use "particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

Here, the ALJ provided a very detailed analysis of each of the Plaintiff's five severe impairments. The ALJ did combine the medical evidence underlying neck pain and the lumbar spine fracture to see if Plaintiff met Listing 1.04 (disorders of the spine). However, Plaintiff did not meet the requirements of Listing 1.04 because "[t]he record does not document . . . . nerve root or spinal cord compromise." Tr. 26. Moreover, the ALJ noted that Plaintiff's MRI of the lumbar and thoracic spine showed "minimal disc herniation," with "no obvious nerve root compression." *Id*. The ALJ considered these test results along with Dr. Fernando's findings that Plaintiff possessed "5/5 strength and normal sensation and reflexes" and seemed highly unlikely to have the requisite "significant . . . herniations or nerve root impingement." *Id*.

The ALJ considered Plaintiff's cardiovascular disease but could not find that it met any of the 4.00 series (cardiovascular system) disabilities. For example, Listing 4.02A1 (systolic heart failure) requires an ejection fraction of 30% or less, and Plaintiff's ejection fraction was over 65%. *Id.* at 25. An angioplasty must demonstrate blood vessel narrowing of at least 50% in order to qualify for Listing 4.02C (coronary artery disease), and Plaintiff's angioplasty noted narrowing of only 30%, and the narrowing was treated with medication. *Id.*

10

The ALJ properly found that Plaintiff did not meet Listing 1.02B (major dysfunction of a major peripheral joint in the upper extremity). That impairment requires "inability to perform fine and gross movements effectively," and there is no dispute that Plaintiff did not provide evidence of this criterion.

The ALJ properly found that Plaintiff's hypertension does not meet any of the listed impairments. "Hypertension" does not itself meet any impairment on the Listing of Impairments, nor can it combine with any of Plaintiff's other symptoms to meet the requirements on a listing. The ALJ did scour the record for evidence of the types of sequelae of hypertension that would equal impairments on the Listing of Impairments. But, as the ALJ noted, "[t]he record does not document any significant end organ damage, such as visual impairment, impairment of renal functioning, or a history of stroke with residuals." *Id.* at 25.

Combining the musculoskeletal impairments with the cardiac/circulatory impairments would have been an exercise in futility. Adding those two types of impairments together would not approximate any impairment on the Listing of Impairments. Critically, Plaintiff never even suggests which impairment on the Listing of Impairments Plaintiff would meet if all his impairments were combined. This is very telling of the fact that the ALJ's analysis was sound. *See Cosby v. Comm'r of Soc. Sec.*, 231 Fed. App'x 140, 146 (3d Cir. 2007) (affirming denial of Plaintiff's appeal where she failed to "argue or even suggest which listing the ALJ should have applied, nor [did] she point to any medical evidence ignored by the ALJ that would show that [Plaintiff's] impairments medically equaled one of the listings.").

### C. The ALJ Did Not Improperly Discredit Plaintiff's Statements About the Limiting Effects of His Symptoms of Pain and Medication Side Effects.

Evaluating Plaintiff's subjective complaints, or "symptoms" as the Social Security Administration refers to them,[7] begins with a two-step process. SSR 96-7p. First, there must be medical signs and laboratory findings that show that a claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. 20 C.F.R. § 416.929(a), (b). In this case, the ALJ found that Plaintiff had satisfied this prong of the analysis.

In the second prong of the process, the ALJ evaluates the intensity and persistence of a claimant's pain to determine how it limits a claimant's capacity to work. 20 C.F.R. § 416.929(a), (c). The assessment of the intensity and persistence of a

---

[7] The Social Security Administration has defined "symptom" as "an individual's own description of his or her physical or mental impairment(s)." SSR 96-7p.

11

claimant's symptoms "obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). When it comes to evaluating credibility, the Social Security Administration has stated:

> In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

In this case, the two pivotal credibility determinations are: (1) whether plaintiff's symptoms (pain and medication side effects) would limit his ability to work by necessitating either (a) a break from a sedentary work station for more than five or ten minutes every hour, or (b) one unscheduled break of ten to fifteen minutes a day; and (2) whether plaintiff's symptoms would cause difficulty with concentration, persistence, or pace. The vocational expert opined that any of these limitations would render Plaintiff unable to work. Tr. 81-83.

The ALJ listed several reasons that he found Plaintiff's "statements concerning the intensity, persistence, and limiting effects" of his symptoms to be "not entirely credible." These included statements the Plaintiff made about his work history, his drinking habits, and how he treated his pain. Also relevant to the credibility determination were the various medical opinions, which weigh slightly against Plaintiff's credibility. At least some of these considerations, plus other evidence on the record, constitutes substantial evidence to support the partial discrediting of Plaintiff's statements about his symptoms.

Plaintiff's statements about his work history raised the ALJ's suspicions about his overall credibility. For example, when Plaintiff was asked why he had no earnings from 2000-2005, Plaintiff answered that he stayed home with three children while his wife worked. It was noted that all his children are in their 20's now, and even the youngest one would have been a teenager by 2005. Asked about this discrepancy at the hearing, Plaintiff clarified that he stayed home from 1993-96. "His lack of earning from 2000-2005 is therefore essentially unexplained," the ALJ concluded. Tr. 28.

Plaintiff also told doctors that he drinks one or two six packs of beer a day, a habit which hurts his credibility because the effects of alcohol could be exacerbating the side effects of the medication.[8] Tr. 27. Heavy drinking, on its own, could also be responsible for his inability to concentrate.

The ALJ noted that Plaintiff had told a doctor at University Hospital that his pain was "tolerable" on percocet. Plaintiff also noted that he had been missing physical therapy appointments. These statements do provide some basis for discrediting the limiting effects of Plaintiff's pain symptoms.

The weight of the medical opinions did not provide strong support for Plaintiff's position that his symptoms disabled him. Two physicians opined that he was not disabled, one opined only that he could not perform prior relevant work, and two opined that he was disabled. The least well-supported opinions were the ones opining disability.

"The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 416.927. In this case, the two medical opinions that supported Plaintiff's statements about his symptoms were also the least well-supported opinions.

The state agency physicians opined that the objective medical evidence did not substantiate plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms. Tr. 97, 110. Both stated that they only found him to be only partially credible based on his activities of daily living and the fact that he showed "no signs of discomfort or difficulty standing, walking, sitting, or with use of upper extremities noted at CE or field interview." Dr. Fernando, who conducted his own diagnostic tests, opined that the Plaintiff should not drive given the combined effect of angina and orthopedic pain, but he stopped short of opining that Plaintiff could do no work at all. Tr. 328.

Dr. Herrera opined that Plaintiff's L-1 fracture, degenerative disc disease, and degenerative changes of the spine were "chronic and exacerbated by prolonged activity, limiting his ability to maintain employment." Tr. 385. Dr. Elesser stated that, based upon those same conditions, plus neck pain from his old shoulder injury, that "He has difficulty in any given position for any significant period of time, but

---

[8] Plaintiff nowhere complains of alcoholism. But if he did, the ALJ could not consider it as a contributing factor anyway. 42 U.S.C. § 423(d)(2)(C).

13

also gets pain with greater than a minimum of activity. He is essentially never completely pain free." Tr. 388.

Dr. Fernando's opinion was the best-supported, as he performed his own diagnostic tests, and his opinion was neutral or slightly adverse to Plaintiff's statements about the intensity and limiting effects of his symptoms. The state agency physicians' opinions were the second best-supported because they performed some observation of the Plaintiff, reviewed his medical records, and explained why they only found him partially credible. Drs. Herrera and Elesser's opinions were the least well-supported of the five opinions because they performed no diagnostic tests, and it was not clear whether they had reviewed Plaintiff's medical records. They did not explain why they found him to be credible. Therefore, the ALJ was entitled to conclude that the medical opinion evidence weighed slightly against Plaintiff's credibility.

This Court also finds it notable that Plaintiff did not complain of any medication side effects to his treating physicians and that, on his Social Security application, Plaintiff did not check off any boxes to indicate that his condition affected any mental capacities. Tr. 215.

In short, substantial evidence did support the ALJ's decision not to credit all of Plaintiff's statements about the limiting effects of his symptoms of pain and medication side effects.

## IV.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**. An appropriate order follows.

/s/ William J. Martini
_____
**WILLIAM J. MARTINI, U.S.D.J.**

**DATE: July 29, 2015**